791 So.2d 273 (2001)
Danny LANGSTON, Appellant
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01575-COA.
Court of Appeals of Mississippi.
May 22, 2001.
*276 Luther C. Fisher, IV, Tupelo, Attorney for Appellant.
Office of the Attorney General by Dewitt T. Allred, III, Jackson, Attorney for Appellee.
BEFORE SOUTHWICK, P.J., BRIDGES, and LEE, JJ.
BRIDGES, J., for the Court:
¶ 1. On December 17, 1997, Danny Langston was indicted on the charge of simple assault on a police officer. A trial was held in the Circuit Court of Tishomingo County, Mississippi, the Honorable Frank Russell presiding. The jury found Langston guilty of the charge of simple assault on a police officer and Judge Russell subsequently sentenced Langston to a term of five years imprisonment. Judge Russell then ordered that the five year sentence be suspended and that Langston be placed on supervised probation for a period of one year. Further, the sentencing order directed that Langston be evaluated by a mental health complex and that he undergo treatment for anger management. In addition to these terms, Langston was ordered by Judge Russell to pay all court costs.
¶ 2. Langston filed a motion for a new trial on June 28, 1999, and this motion was denied by the trial court. Langston filed a timely notice of appeal on September 22, 1999, and prays that this Court reverse his guilty verdict and grant him a new trial, citing the following errors for our consideration:
1. Whether the trial court erred when it failed to declare a mistrial following the prosecutor's "send a message" type argument during closing statements?
2. Whether the trial court erred when it failed to dismiss Juror Lonnie McKee from the jury or when it failed to grant a mistrial because Juror McKee was an incompetent juror?
3. Whether the trial court erred in excluding the testimony of defense witness, Clay Walls?

*277 4. Whether the jury verdict was against the overwhelming weight of the evidence?

FACTS
¶ 3. On September 22, 1997, Officer J.C. Ledgewood was on duty as a dispatch officer in Iuka, Mississippi. Because the city hall had been burned in a fire, Ledgewood was serving his duties at a temporary police station, a trailer located in front of the remains of city hall. Ledgewood testified that he was wearing his summer police uniform, a short-sleeved knit shirt with an embroidered badge on it, and could therefore be easily identified as a police officer. Around 12:15 p.m. that day, Langston came around the trailer looking for Ledgewood concerning a traffic ticket that Ledgewood had previously issued to Langston's wife. Langston approached the trailer after seeing someone inside and declared his intentions, at which time Ledgewood disclosed that he was the person for whom Langston was looking.
¶ 4. Upon introducing himself as J.C. Ledgewood, he extended his hand to Langston. Langston then informed Ledgewood that he had no intention of shaking his hand. Ledgewood further testified that Langston "slapped" his hand away and called him a "son of a bitch." Langston then accused Ledgewood of being the reason that Langston's wife was hospitalized for a heart attack. Langston denies that he slapped Ledgewood's hand away, but does acknowledge that he cursed at Ledgewood, refused to shake his hand and blamed him for his wife's ailments. Ledgewood additionally testified that Langston threatened to sue Ledgewood and the City of Iuka for his wife's health problems.
¶ 5. The facts after this point are completely in dispute by the parties. Ledgewood testified that Langston attempted to enter the trailer to assault Ledgewood, and that, in fact, Langston did slap at Ledgewood's face and arms, eventually causing a red welt on Ledgewood's arm. Ledgewood testified that he attempted no physical harm on Langston, but rather simply raised his hands and pushed Langston away to defend himself. Ledgewood stated that, although Langston was located at the bottom of the steps to the trailer while he was at the top, Langston was a tall man and was able to reach Ledgewood's face from where he stood.
¶ 6. On the other hand, it is Langston's testimony that Ledgewood became physically violent with him upon Langston's accusations. Langston stated that Ledgewood kicked him and attempted to push him down the steps of the trailer in an effort to keep him from coming inside. Langston testified that he only wanted to enter the trailer to discuss his accusations with Ledgewood, but that Ledgewood became more violent upon his attempt to do so. However, Ledgewood testified that Langston began slapping, hitting and cursing at him almost from the moment that Langston discovered Ledgewood's identity. Ledgewood further asserts that he tried to calm Langston and insisted that Langston could not enter the trailer because he would not permit such behavior inside a place of business. Shortly after the alleged assault by Langston, Langston left the trailer to speak with other city officials about his complaints and accusations, all the while cursing Ledgewood and threatening to sue him and the city.
¶ 7. The events leading up to this confrontation between Ledgewood and Langston are as follows. On July 8, 1997, Donna Langston ("Donna"), Langston's wife, was issued a citation by Ledgewood for improper parking in a WalMart parking lot. Donna claims that during her encounter with Ledgewood, he was extremely *278 rude and unprofessional and spoke very roughly to her in a loud voice, which she claims could be heard throughout the entire parking lot. Donna stated that another man, Clay Walls, heard Ledgewood that day and observed that his manner was just as Donna claims. According to Donna, Walls even attempted to intercede in the conversation between her and Ledgewood on her behalf. Donna claims that she was not illegally parked and that, even if she had been, Ledgewood's attitude toward her was unwarranted. Upon accepting the parking ticket from Ledgewood, she went home and complained of this incident to her husband, Langston.
¶ 8. That same afternoon, the Langstons made a phone call to David Nichols, the mayor of Iuka, to complain about Ledgewood's alleged abusive behavior toward Donna. Nichols instructed the couple to write a letter of complaint, which they did. Further, one of the city aldermen requested that Donna give him the parking ticket she received to aid in the investigation of the matter. Shortly after a hearing before the board of aldermen, which included the testimony of Donna and Walls, the board found that Ledgewood was probably out of line and should be punished for his conduct. The board instructed Ledgewood to apologize to Donna for his behavior that day, or if he chose not to do so, he would be suspended from the police force for three days. Ledgewood admittedly refused to apologize to Donna, citing that he did not believe he had acted the way she described nor done anything wrong. He further appealed to the board, which subsequently upheld its first decision and Ledgewood accepted his three day suspension, still refusing to make an apology to Donna.
¶ 9. Following the board's disciplinary decision, the Langstons assumed that the matter was over and that the ticket issued by Ledgewood had been administratively handled. The Langstons claim that they never received any notification that there was to be a trial held on the matter of Donna's parking ticket. On September 21, 1997, however, Donna received a letter from the City of Iuka notifying her that she was being fined $125, or in the alternative, her driver's license would be suspended, for failure to appear in court for the trial on her parking ticket. Ledgewood was present at the trial. The Langstons were very upset about this alleged misunderstanding and claimed that they were not notified properly of the trial and they should therefore not be held responsible for not appearing. After meeting with a justice court judge about the matter, the Langstons were told they could appeal the decision, but that it would cost them $100 to do so. The Langstons then became even more angry and frustrated over the matter which they believed to be a total injustice.
¶ 10. The record also contains testimony regarding an incident between Langston and one of the city's aldermen. Apparently, not long after Donna received notice that she had failed to appear for the trial on her parking ticket, Langston ran into the alderman on the street and began to speak with her in an angry tone about all of the previous events regarding the ticket and Ledgewood. According to testimony in the record, Langston cursed at the alderman and loudly expressed his outrage and vengeful feelings over the matter, threatening to "own" the city and its officials. The account of this event reflected Langston's intense temper, and other testimony proffered by Langston himself proved that the city alderman and Ledgewood were not the only persons subjected to his anger and use of profanity over the parking ticket incident. Langston's fury grew worse as the issuance of this ticket continued to snowball into much bigger *279 problems for the Langstons. In fact, a few minutes after the encounter between Langston and the city alderman, Donna began having chest pains and was taken to the hospital where she was told that she experienced a mild heart attack. Langston attributes his wife's heart attack to all of these mounting problems connected with Ledgewood's issuance of the parking ticket. He ultimately blames the City of Iuka and Ledgewood personally for his wife's unfortunate situation.
¶ 11. Shortly after Donna had settled down at the hospital, Langston admittedly headed over to city hall to confront Ledgewood about the incident. This is when the assault in question occurred. Ledgewood subsequently filed assault charges against Langston, after which Langston filed assault charges against Ledgewood in return. However, the charges filed against Ledgewood were dropped because of Langston's failure to appear in court on the matter to preserve his own action. A trial on the charges filed against Langston ensued and Langston was found guilty of simple assault on a police officer by a jury of his peers.
¶ 12. Langston argues that he suffered an unfair trial because of reversible errors on the part of the trial court. Specifically, Langston feels aggrieved that a juror whom he believes to be related to Ledgewood was allowed to remain on the jury even after discovery of the alleged conflict. He further asserts that his own witness, Walls, whom he had planned to call to attest to Ledgewood's behavior at Wal-Mart the day he issued Donna the ticket, was erroneously not allowed to testify. Langston cites that these errors invoked prejudice against him. Langston also claims that Ledgewood's counsel was erroneously allowed to make certain prohibited statements in his closing argument that evoked sympathy from the jurors. Finally, he contends that the jury verdict was against the overwhelming weight of the evidence presented. Langston asks this Court to reverse and remand his case for a new trial in order to cure all of these alleged errors.

STANDARD OF REVIEW
¶ 13. Our standard of review regarding a motion for new trial is stated in McClain v. State:
The challenge to the weight of the evidence via motion for a new trial implicates the trial court's sound discretion. Procedurally such challenge necessarily invokes Miss.Unif.Crim.R. of Cir.Ct. Prac. 5.16. New trial decisions rest in the sound discretion of the trial court, and the motion should not be granted except to prevent an unconscionable injustice. We reverse only for abuse of discretion, and on review we accept as true all evidence favorable to the State.
McClain v. State, 625 So.2d 774, 778 (Miss. 1993). See also Collier v. State, 711 So.2d 458, 461 (Miss.1998); Herring v. State, 691 So.2d 948, 957 (Miss.1997). Our standard of review regarding the legal sufficiency of the evidence is as follows:
[W]e must, with respect to each element of the offense, consider all of the evidence not just the evidence which supports the case for the prosecutionin the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fairminded *280 jurors could only find the accused not guilty.
Wetz v. State, 503 So.2d 803, 808 (Miss. 1987).
¶ 14. "The jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." Billiot v. State, 454 So.2d 445, 463 (Miss.1984). This Court may not make an assessment on the credibility of the trial witnesses as this task is one for the jury presiding over the matter. Kinzey v. State, 498 So.2d 814, 818 (Miss. 1986). When this Court analyzes a jury's verdict to determine whether it goes against the overwhelming weight of the evidence, we must keep in mind that the jury is the ultimate finder of fact. This Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible. The law provides:
Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.
Groseclose v. State, 440 So.2d 297, 300 (Miss.1983).

LEGAL ANALYSIS

1. Whether the trial court erred when it failed to declare a mistrial following the prosecutor's "send a message" type argument during closing statements?
¶ 15. We find that Langston is procedurally barred from raising this claim challenging certain statements made during the closing argument of Ledgewood's case. At no time during these closing statements did Langston make an objection to what he now believes to be an improper "send a message" argument by Ledgewood's attorney. Because this issue is raised for the first time on appeal, we find that it is waived for failure to make a contemporaneous objection. Wells v. State, 698 So.2d 497, 514 (Miss.1997); Ballenger v. State, 667 So.2d 1242, 1272 (Miss. 1995); Davis v. State, 660 So.2d 1228, 1245 (Miss.1995); Chase v. State, 645 So.2d 829, 854 (Miss.1994); Hansen v. State, 592 So.2d 114, 139-40 (Miss.1991). As such, we find no further discussion of this issue to be necessary.

2. Whether the trial court erred when it failed to dismiss Juror Lonnie McKee from the jury or when it failed to grant a mistrial because Juror McKee was an incompetent juror?
¶ 16. Langston is arguing that McKee should have been rendered an incompetent juror because he could not have possibly returned a fair and impartial judgment in this case. Langston believes that he was cheated out of the use of a peremptory challenge against McKee because McKee did not disclose that he had a family relationship with Ledgewood. Langston raised his objection to McKee mid-trial, rather than at the time of voir dire, seeking *281 to have McKee removed from the jury. This request was denied by the trial judge.
¶ 17. "A juror removed on a causal challenge is one against whom a cause for challenge exists such that the juror's impartiality at trial is likely affected." Fleming v. State, 732 So.2d 172, 180 (Miss.1999). See Doss v. State, 709 So.2d 369, 385 (Miss.1997). The trial judge has complete discretion to dismiss any juror if he is convinced that the juror is not able to try the case without bias. Id. at 181. "This Court is required to reverse the trial court when this Court clearly is of the opinion that a juror was not competent." Id.; Dennis v. State, 91 Miss. 221, 229, 44 So. 825, 826 (1907). If a party fails to object to a juror before the jury is empaneled, that party waives any right to complain of the jury's composition at a later time. McNeal v. State, 617 So.2d 999, 1003 (Miss.1993); Myers v. State, 565 So.2d 554, 557 (Miss.1990); Pickett v. State, 443 So.2d 796, 799 (Miss.1983); Watkins v. State, 262 So.2d 422, 423 (Miss. 1972); Holloway v. State, 242 So.2d 454, 455-56 (Miss.1970). However, there are certain circumstances where a juror may be excused after he has already been accepted. McNeal, 617 So.2d at 1003.
¶ 18. A juror may be dismissed after the jury has been empaneled in two instances: (1) where the juror is unable to perform his duties; and (2) where the juror is disqualified. Id.; Miss. Code Ann. § 13-5-1 (1972). Aside from having been convicted of an "infamous crime" in the past, a juror may be disqualified if he withholds or misrepresents information upon being asked a "clearly worded" question during voir dire. McNeal, 617 So.2d at 1003; Miss.Code Ann. § 13-5-67 (1972). If information is withheld by a juror and the evidence shows that a fuller and more complete response or any response at all would have provided a legitimate basis for challenge, the trial court must grant a new trial and if it does not, this Court must reverse on appeal. Myers, 565 So.2d at 558.
¶ 19. Looking further to Odom v. State, 355 So.2d 1381, 1383 (Miss. 1978), it is the duty of the trial court to assess whether the question asked of the juror was "(1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." If the court finds that these inquiries point unequivocally to the fault of the juror, it then must ask whether there was prejudice to the defendant resulting from the juror's failure to respond accurately to a voir dire question. Id. As there is no firm rule guiding the courts in every given situation of voir dire examination, these matters must be determined on a case by case basis. Id.
¶ 20. We find that McKee was properly allowed to continue as a juror after Langston's mid-trial objection to his presence. We are convinced that the trial judge was correct in his decision that McKee could render a fair and impartial judgment in this matter along with all of his fellow jurors. The questions asked of McKee and the other jurors that are at issue here are as follows: (1) "As to ... Officer J.C. Ledgewood, are any of you related by blood or marriage?" and (2) "Any of you have any type of friendship, acquaintanceship, relationship with ... Officer Ledgewood?" McKee did not answer in the affirmative to these questions when they were asked because he did not believe himself to be included in any of those categories. The discovery later made by Langston was that McKee's twin brother's wife (McKee's sister-in-law) is in some manner (unknown by McKee) related to Ledgewood's nephew by marriage.
*282 ¶ 21. We find this so-called relationship to be quite distant, if it qualifies as a relationship at all. There are no blood ties whatsoever between McKee and Ledgewood themselves and a very remote relation, at best, by marriage, such that McKee is not even certain what his sister-in-law's relationship to Ledgewood's nephew-in-law is. After Langston's discovery of this convoluted relationship in the middle of the trial, he raised an objection, at which time McKee was again questioned individually. When asked point blank whether he was related to Ledgewood's nephew by marriage, McKee gave the above description of the relationship. It is clear to this Court that McKee was not attempting to pull the wool over anyone's eyes here, but that he simply did not consider that this extremely complicated association through several bloodlines and marriages would classify Ledgewood as his direct blood or marriage relative. McKee said as much when he made it plain that he did not even understand the exact nature of his connection to Ledgewood.
¶ 22. Furthermore, when asked by the judge whether he could, despite this "relationship," return a fair and unbiased decision in this case, McKee answered that he could and that he would find for either side that proved its case to him. He quite obviously has no serious family ties to Ledgewood by virtue of this confusing affiliation. "Any person ... who will make oath that he or she is impartial ... shall be competent as a juror in any criminal case.... Any juror shall be excluded however, if the court be of the opinion that he or she cannot try the case impartially...." McNeal, 617 So.2d at 1004. See Burt v. State, 493 So.2d 1325, 1327 (Miss.1986); Miss.Code Ann. § 13-5-79 (1972). The judge is the person empowered with the very broad discretion to decide whether a juror can be impartial. McNeal, 617 So.2d at 1003. See Burt, 493 So.2d at 1327.
¶ 23. The Mississippi Supreme Court, in cases such as McNeal, has provided that a judge can look past complex and remote relationships, such as the one here, if he believes that the juror is not practicing bias or scheming to side with one party because of a familial or other close relationship to that party. McNeal, 617 So.2d at 1003. To do otherwise would invite an eventual breakdown of the reliable and so far successful system of a person having the constitutional right to be judged by a jury of his peers. See Fleming, 732 So.2d at 181-82; Lewis v. State, 580 So.2d 1279, 1282-83 (Miss.1991); McNeal, 617 So.2d at 1002-04 (discussing different types of relations, circumstances and/or friendships closer than the one in the instant case where the courts found no necessity for exclusion of the juror).
¶ 24. We find that McKee was ready and able to perform his duties as an impartial juror in this case. Further, we are not convinced by Langston that McKee should have been disqualified or found incompetent to try this case simply because of an extraordinarily distant familial association with Ledgewood. In applying the Odom test, we note that while the question posed to McKee during voir dire regarding blood and marital relations was relevant to the case, McKee certainly did not possess "substantial" knowledge of his so-called relation to Ledgewood, nor do we believe that the ambiguity prong is satisfied. Odom, 355 So.2d at 1383. To say the very least, the question of relationships posed by Langston's counsel to the jurors was grossly understated in light of the information for which he was evidently looking. In other words, merely asking someone whether they have a blood or marriage relationship to a party in the case is not likely to trigger an affirmation by a juror *283 that his brother is related by marriage in some indeterminate way to the victim's nephew by marriage. If Langston's counsel wished to elicit such an insignificant relation in order to attempt to challenge McKee as an incompetent juror, he should have asked whether there was any conceivable faraway family connection with Ledgewood. Only then would we find it necessary for McKee to have spoken up.
¶ 25. As to the second part of the Odom test, we conclude that the trial judge did not abuse his discretion in finding that McKee could administer a fair and impartial decision in this case based on his interrogation of McKee. Furthermore, Langston has shown us nothing that would even hint at prejudice for allowing McKee to try this case with the other jurors. Because we may not disturb the trial judge's decision unless it appears to be "clearly wrong," we uphold the trial judge's decision to allow McKee to remain on the jury. Lewis, 580 So.2d at 1283.

3. Whether the trial court erred in excluding the testimony of defense witness, Clay Walls?
¶ 26. "While the accused enjoys wide latitude in the presentation of witnesses, it is within the discretion of the trial judge to exclude proffered defense testimony, especially when it is collateral to the issues at hand." Davis v. State, 680 So.2d 848, 850 (Miss.1996); Brent v. State, 632 So.2d 936, 944 (Miss.1994). Rule 403 of the Mississippi Rules of Evidence provides that evidence presented to the court must be relevant, meaning that the probative value of the evidence must not be outweighed by a danger of "unfair prejudice, confusion of the issues, or misleading the jury...." M.R.E. 403; Davis, 680 So.2d at 850; Brent, 632 So.2d at 944. If the issues and/or evidence of a case deal with collateral matters, they are irrelevant for purposes of argument. Glaskox v. State, 659 So.2d 591, 594 (Miss.1995); Mallett v. State, 606 So.2d 1092, 1095 (Miss. 1992). A trial judge has broad discretion when deciding whether evidence is relevant and therefore admissible. Weeks v. State, 493 So.2d 1280, 1284 (Miss.1986); Shearer v. State, 423 So.2d 824, 826 (Miss. 1983). This Court may not reverse the judge's decision unless we find that his discretion has been abused. Id.
¶ 27. In the instant case, we do not subscribe to Langston's theory that the testimony of Walls is necessary, relevant or admissible in this matter. The trial judge did not abuse his discretion in finding so. We find the issues and evidence to which Walls would have testified, specifically, Ledgewood's conduct on the day that he issued a parking ticket to Donna Langston, to be strictly collateral, holding no relevance to Langston's assault on Ledgewood which happens to be the only issue that is of any concern here. It was not this jury's job to decide whether Ledgewood acted improperly that day in the WalMart parking lot. Rather, it was this jury's duty to render a decision on whether Langston was guilty of assaulting Ledgewood on September 22, 1997. As such, Walls's testimony was not crucial or relevant to Langston's defense and therefore was correctly disallowed. The manner in which Langston repeatedly goes over and over the details of the events which took place in the WalMart parking lot throughout this case proves nothing at all about Langston's guilt in slapping or hitting Ledgewood.
¶ 28. Furthermore, Langston's continuous attempts to refer to these specific instances of conduct on the part of Ledgewood, through Walls's testimony or through other evidence, are not permitted by the Mississippi Rules of Evidence. See M.R.E. 405. The use of specific instances of conduct of a party are admissible into *284 evidence only to prove the character of a party or witness through reputation or opinion. Id.; Pinson v. State, 518 So.2d 1220, 1223-24 (Miss.1988); M.R.E. 405. Clearly, that is not the purpose of Langston's never ending references to the Wal-Mart incident. Rather, it is evident that Langston is trying to prove that this incident led him to feel compelled to confront Ledgewood or that it justified his assault on Ledgewood in some way, which in our opinion is a shaky defense, at best.
¶ 29. We endeavor to remind Langston, as it appears he has forgotten, that Ledgewood was not on trial for speaking rudely to Donna in the WalMart parking lot and issuing her a parking ticket. The record plainly reveals that Ledgewood had already been heard, found guilty and punished for that incident. Rather, it was Langston himself that was on trial for his assault on a police officer, a fact which Walls knows nothing about because he was not present during the assault. Walls's testimony could therefore have added nothing to Langston's defense, but instead would only have served to further highlight irrelevant information.

4. Whether the jury verdict was against the overwhelming weight of the evidence?
¶ 30. The jury in this case was subjected to much immaterial evidence regarding the parking ticket incident at WalMart between Donna and Ledgewood. However, they also heard how Langston went to where Ledgewood was working and attempted to slap him in the face, but missed and slapped him on the arm. They even heard evidence of Langston's additional displays of his nasty temper and use of profanity with other city officials. What they apparently did not hear were any convincing rebuttals to all of this evidence which would serve to plant doubt in their minds of Langston's guilt here. Langston goes so far in his brief as to argue that the jury did not want to convict him of assault on a police officer, but rather asked the judge if they could convict him of a lesser crime. Even if there were evidence of this claim, it would certainly not support a verdict of not guilty. However, there is no evidence of this allegation and it is fervently contested by the State.
¶ 31. It is not the job of this Court to determine what parts of the conflicting evidence are true and we may not disturb the jury's verdict without an absence of substantial evidence to support it. Pinson, 518 So.2d at 1224; Billiot v. State, 454 So.2d 445, 463 (Miss.1984); Groseclose, 440 So.2d at 300. "The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory and sincerity." Noe v. State, 616 So.2d 298, 303 (Miss.1993) (quoting Jones v. State, 381 So.2d 983, 989 (Miss.1980)). For this Court to reverse the verdict and give Langston a new trial on this matter, we would have to find that the verdict is not only contrary to the weight of the evidence, but that no reasonable juror could have arrived at a verdict of not guilty. Butler v. State, 544 So.2d 816, 819 (Miss.1989); Wetz, 503 So.2d at 808. We cannot do that.
¶ 32. We find that there is sufficient evidence to support the jury's findings here. Whether or not we believe that Donna's encounter with Ledgewood in the WalMart parking lot on September 22, 1997, resulted in her health problems is neither here nor there. Moreover, it is not the concern of this Court that the Langstons' run of bad luck, beginning with the infamous parking ticket, may have caused Langston to wrongfully take revenge on behalf of his wife. We commend the jury for rendering their verdict according to the *285 evidence they found to be true and pertinent to this case of assault.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF TISHOMINGO COUNTY OF CONVICTION OF SIMPLE ASSAULT ON A LAW ENFORCEMENT OFFICER AND FIVE YEAR SUSPENDED SENTENCE WITH ONE YEAR SUPERVISED PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., PAYNE, THOMAS, LEE, IRVING, MYERS AND CHANDLER, JJ., CONCUR.