LEE, P.J.,
 

 for the Court.
 

 PROCEDURAL HISTORY
 

 ¶ 1. Terrance Watkins was convicted in the Bolivar County Circuit Court of murder. He was sentenced as a habitual offender to life without eligibility for parole or probation in the custody of the Mississippi Department of Corrections. Watkins filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the
 
 *808
 
 alternative, a new trial, which was denied by the trial court. Watkins now appeals his conviction, asserting the following issues: (1) the trial court erred when it ruled during cross-examination that certain testimony of the State’s chief witness was not relevant, and (2) the verdict was against the legal sufficiency and overwhelming weight of the evidence. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. N.L. Thompson was riding his bicycle through a neighborhood in Pace, Mississippi, when some teenagers started harassing him. Thompson told the teenagers that he was going to tell their parents, and he began riding through the neighborhood attempting to contact relatives of the teenagers. Thompson rode his bike to Rodney Lee’s house. Thompson asked Lee to call Watkins, a/k/a Psycho, to tell him that one of his relatives was harassing Thompson. Lee testified that this occurred sometime between 10:00 p.m. and 11:30 p.m. on the night of the murder. Thompson next went to Mary Miller’s house and told her that her son was harassing him. Miller began walking through the neighborhood looking for her son. Thompson continued through the neighborhood contacting other relatives.
 

 ¶ 3. Lee testified that Watkins arrived at his house approximately an hour after he had called him. Lee testified that Watldns sat on the porch and talked to him for approximately thirty minutes while Lee picked up trash in his yard. Thompson came back to Lee’s house on his bicycle. Thompson saw Watkins sitting on the porch and said twice, “Let me holler at you.” Watkins did not respond, so Thompson rode his bicycle closer to the porch. According to Lee, Thompson got off the bicycle and walked up the steps to the porch. Watkins began shooting at Thompson, and Thompson ran across the street into a vacant lot. Watkins continued shooting and chased Thompson into the va.cant lot. When the shooting stopped, Watkins ran off down the street. Miller heard the shots and returned to Lee’s yard. Miller saw Thompson’s body in the vacant lot across the street. Lee had a cell phone in his hand, but he testified that he could not dial 911 because he was in “such outrage.” Lee asked Miller to call 911. Watkins was later arrested for Thompson’s murder. The gun used in the shooting was never recovered.
 

 DISCUSSION
 

 I. RELEVANCE OF LEE’S TESTIMONY
 

 ¶ 4. Lee was called as a witness for the State. On cross-examination, Lee was questioned concerning a prior tumultuous relationship between Lee’s sister and Thompson. After the defense asked Lee several questions about his sister’s relationship with Thompson, the State objected to the relevance of the testimony. Counsel for Watkins responded that the purpose of the questioning was to show bias pursuant to Mississippi Rule of Evidence 616.
 

 ¶ 5. The following exchange took place between Watkins’s counsel and Lee during cross-examination:
 

 Q. [Your sister] and N.L. had problems; had they not?
 

 A. Yeah. Back in the days. But her [sic] and N.L. didn’t have nothing going on at this point in time.
 

 Q. Wasn’t there a restraining order against N.L. at that time—
 

 BY [THE STATE]: — Objection, Your Honor, to relevance.
 

 BY THE COURT: I am having difficulty seeing the relevance.
 

 A. No.
 

 
 *809
 
 BY THE COURT: Wait a minute, Mr. Lee.
 

 [[Image here]]
 

 BY THE COURT: I’m having difficulty seeing the relevance of the testimony.
 

 BY [THE DEFENSE]: Well, Judge, it’s for impeachment purposes. He’s identifying my client as the shooter when there is a good possibility that somebody else did the shooting.
 

 BY THE COURT: I haven’t heard any testimony to that effect.
 

 BY [THE DEFENSE]: Well, but I can show that someone else other than the defendant had a reason to or could have committed the offense.
 

 BY [THE STATE]: Your Honor, I don’t believe she could show that by talking about what may have happened with [Lee’s sister] some time ago.
 

 BY [THE DEFENSE]: Well, I’m talking back in August of '06 and if he doesn’t know all he has to do is say, “I don’t know.”
 

 BY THE COURT: Well, it’s got to be relevant before we even ask him the question.
 

 BY [THE DEFENSE]: That’s the relevancy of it, Judge.
 

 [[Image here]]
 

 (BOTH COUNSEL APPROACH THE BENCH AND THE FOLLOWING CONFERENCE IS HELD:)
 

 BY THE COURT: All right, tell me what you’re trying to show.
 

 BY [THE DEFENSE]: This gentleman’s sister — it goes to show bias.... His sister and N.L. Thompson had a tumultuous relationship back at that time. So much so that she went to get a restraining order against him. We could show that this witness has knowledge to name somebody else—
 

 BY [THE STATE]: — But he already said she wasn’t there that night.
 

 BY THE COURT: Is there any evidence — are you trying to say that the sister may have shot him?
 

 BY [THE DEFENSE]: I’m just asking a question about that day—
 

 BY THE COURT: — Is there any evidence the sister was present at the time of the incident? At the time of the shooting?
 

 BY [THE DEFENSE]: I don’t know if she was or not.
 

 BY THE COURT: Do you have anything, any evidence at all to suggest she may have been?
 

 BY [THE DEFENSE]: Other than from my witnesses[?]
 

 BY THE COURT: Do they say she was at the incident?
 

 BY [THE DEFENSE]: Well, they can’t say she was there because they wasn’t [sic] there.
 

 BY THE COURT: Do you have any evidence at all that would suggest that this person was at the scene at the time of the commission of this crime?
 

 BY [THE DEFENSE]: I don’t have any evidence that puts her there, no.
 

 BY THE COURT: Then I’m going to sustain the objection.
 

 BY [THE DEFENSE]: Okay.
 

 (BENCH CONFERENCE CONCLUDED)
 

 ¶ 6. Watkins argues on appeal that he was trying to use evidence of bias against Lee to show that Lee had motive to kill Thompson. Watkins argues he could have shown that Lee had a motive to shoot Thompson due to Thompson’s past relationship with Lee’s sister. However, that argument was not raised in this quoted exchange. It appears that Watkins’s argument at trial was that Lee’s sister may have shot Thompson in retaliation of his treatment of her. Watkins’s argument
 
 *810
 
 that Lee had motive to kill Thompson for Thompson’s past treatment of Lee’s sister is made clear for the first time on appeal.
 

 ¶ 7. “A trial court has great latitude in admission or exclusion of evidence where the question is one of materiality or relevancy, and its decision should only be reversed where this discretion is abused.”
 
 Blocker v. State,
 
 809 So.2d 640, 645(¶20) (Miss.2002). Watkins is correct in his argument that “[c]ross-examination shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.” M.R.E. 611(b);
 
 see also Hill v. State,
 
 512 So.2d 883, 884 (Miss.1987) (“a witness on cross[-] examination may be interrogated regarding his interest, bias or prejudice in a case”). However, no proffer was made of the testimony, nor was a statement dictated into the record to indicate what was proposed to be shown by the cross-examination. The supreme court has held that “a trial court will not be reversed for limiting cross-examination where ‘no proffer was made of the testimony nor was a statement dictated into the record to indicate what was proposed to be shown by the examination.’ ”
 
 Blocker,
 
 809 So.2d at 646(¶ 22) (quoting
 
 McGee v. State,
 
 365 So.2d 302, 304 (Miss.1978)).
 

 ¶ 8. Watkins argues that the explanation to the trial court that he was attempting to show bias was enough to be considered a proffer. Watkins argues that it was his intention to show bias on behalf of Lee and not Lee’s sister, and the trial judge misunderstood his argument. However, nowhere does it appear that Watkins tried to show that Lee may have been the one who killed Thompson. In fact, when the trial judge asked Watkins’s attorney what she was trying to prove, she stated: “We could show that this witness has knowledge to name
 
 somebody else
 
 .... ” (Emphasis added). From this explanation, the trial judge understood that the defense was attempting to show that “somebody else” other than Lee, such as Lee’s sister, could have been the shooter. Nowhere does it appear that a proffer or explanation was made to the trial court that Watkins was trying to show that Lee was the shooter.
 

 11 9. We, therefore, find that this issue is procedurally barred as the argument that the purpose of the cross-examination was to show that Lee could have been the shooter is raised for the first time on appeal.
 

 II. LEGAL SUFFICIENCY AND WEIGHT OF THE EVIDENCE
 

 ¶ 10. The main evidence presented by the State of Watkins’s guilt was Lee’s testimony and the results of the gunshot-residue test done on Watkins’s hand. Watkins presented an alibi defense at trial that he was in Rosedale, Mississippi on the night of the shooting. Watkins argues that the State failed to meet its burden of proof, and the evidence was insufficient to support the verdict of the jury. Therefore, Watkins argues that the trial court erred when it denied his motion for a JNOV or, in the alternative, motion for a new trial.
 

 A. Legal Sufficiency of the Evidence
 

 ¶ 11. In order for this Court to uphold the denial of a motion for a JNOV, the evidence must show “beyond a i'easonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”
 
 Bush v. State,
 
 895 So.2d 836, 843(1116) (Miss.2005) (quoting
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). If the facts and inferences “ ‘point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond
 
 *811
 
 a reasonable doubt that the defendant was guilty,’ the proper remedy is for the appellate court to reverse and render.”
 
 Id.
 
 (quoting
 
 Edwards v. State,
 
 469 So.2d 68, 70 (Miss.1985)).
 

 ¶ 12. Murder is defined as “[t]he killing of a human being without the authority of law by any means or in any manner ... [w]hen done with deliberate design to effect the death of the person killed.... ” Miss.Code Ann. § 9Y — 3—19(1)(a) (Rev. 2006). Watkins argues that no rational trier of fact could have found him guilty of murder because of factual inconsistencies in the testimony of the witnesses for the prosecution.
 

 ¶ 13. Watkins asserts that Lee’s testimony was contradictory because Lee testified that he saw Watkins chase Thompson through the yard, yet Lee also testified that he ran inside his house to take cover. Further, Watkins argues that Lee’s testimony conflicts with Miller’s testimony that she saw Lee standing in his yard soon after hearing the shots. Lee testified that when he saw Watkins start shooting at Thompson, “I ran. When [WatkinsJ chased him across, I was getting out the way.” Lee stated that he went into his house and sat down for a minute before coming back outside. He testified that when he walked out, Miller was in his yard. Miller testified that after she heard the shots, she came back to Lee’s house. She stated: “When I came back to the corner, [Lee] was standing out there and I asked him what happened.” We do not find that Lee’s testimony was contradictory. All that this testimony showed was that Lee and Miller walked back into Lee’s front yard at approximately the same time. Regardless, “any factual disputes are properly resolved by the jury [and] not by an appeals court.”
 
 Brown v. State,
 
 934 So.2d 1039, 1044(¶ 18) (Miss.Ct.App.2006). “This Court does not have the task of reweighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible.”
 
 Id.
 
 at (¶ 19) (quoting
 
 Langston v. State,
 
 791 So.2d 273, 280(¶ 14) (Miss.Ct.App.2001)).
 

 ¶ 14. Next, Watkins argues that the fact that Miller called 911 while Lee had a cell phone in his hand should have arisen the suspicions of any reasonable juror. Miller testified that Lee seemed “jittery” after the shooting. She testified, “he was telling me to call 911 but he had the phone in his hand. So I assumed that he was nervous like I was.” She testified that she did not know if he was on the phone with someone when he told her to call 911. Lee testified that he told Miller to call 911 because he was in “such outrage” he “couldn’t dial [the number].”
 

 ¶ 15. We cannot find that the arguments raised by Watkins point in his favor as to any of the elements of murder. Whether or not Lee witnessed the murder was a factual question for the jury to resolve. Further, the fact that Lee was “jittery” after the shooting and asked Miller to call 911 does not prove or disprove any of the elements of murder. Lee was not on trial, and the State did not bear the burden of proving that Lee was not involved in the murder. Considering the evidence in the light most favorable to the State, we find that the evidence was sufficient for a reasonable jury to find Watkins guilty of murder. Therefore, we find that this argument is without merit.
 

 B. Weight of the Evidence
 

 ¶ 16. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would
 
 *812
 
 sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844(¶ 18). When reviewing the weight of the evidence, this Court sits as a “thirteenth juror.”
 
 Id.
 

 ¶ 17. Watkins argues that he should be granted a new trial because no “reliable physical, forensic, or occurrence evidence” was presented to the jury. He contends that the State’s case centered around Lee’s testimony, which was uncorroborated and contradictory. Watkins also asserts that the jury failed to consider his alibi defense that he was in Rosedale at the time of the murder. Finally, he argues that the gunshot-residue test performed on his hands after the murder was not conclusive.
 

 ¶ 18. Watkins asserts that the law enforcement officers made up their minds that he was the shooter before the investigation started; thus, they failed to investigate Lee as a suspect. Lee was arrested after the murder, but Investigator Gerald Wesley of the Bolivar County Sheriffs Department testified that Lee was arrested for withholding evidence and not because he was a suspect. Investigator Wesley testified that Lee did not want to talk to law enforcement at first because “[Lee] was friends to both of them [Thompson and Watkins]. He didn’t want to get involved for one thing.... He was not telling all the truth about what he knew.”
 

 ¶ 19. Watkins testified that on the day of the shooting, Kendall Lambert, his cousin, picked him up between 9:00 p.m. and 10:00 p.m. in Pace to go to The Breakfast Club in Rosedale. The driving time between Pace and Rosedale is approximately ten to fifteen minutes. Watkins testified that he stayed at the club until approximately 1:00 a.m., when the club closed. He denied any knowledge of the shooting.
 

 ¶ 20. Watkins presented two witnesses to corroborate his alibi that he was in Rosedale on the night of the murder. However, neither of these witnesses could testify as to Watkins’s whereabouts after 10:00 p.m. or before 12:00 a.m. First, Lambert testified that he and Watkins left Pace sometime between 9:00 p.m. and 10:00 p.m. to go to Rosedale. Lambert testified that they got to Rosedale sometime before 10:00 p.m., and he dropped Watkins off in an area with several night clubs. Lambert did not see Watkins again that night. Next, Kendrick Taylor, the owner of The Breakfast Club, testified that he saw Watkins at his club sometime between midnight and 1:00 a.m. The only other testimony regarding Watkins’s whereabouts was from Deputy Joey Davis of the Bolivar County Sheriffs Department, Watkins’s uncle, who picked up Watkins at 3:00 a.m. in Rosedale and drove him in his patrol car to the Bolivar County Correctional Facility.
 

 ¶ 21. David Whitehead, a forensic scientist with the Mississippi Crime Laboratory, performed the analysis of the gunshot-residue test which was taken after Watkins’s arrival at the correctional facility. Samples were taken from the palms and the backs of Watkins’s hands approximately four hours after the murder occurred. Whitehead testified that gunshot residue stays on a person who is doing normal activities for four hours. He testified that most gunshot residue is removed when a person thoroughly washes his or her hands. Whitehead testified that particles containing lead, barium, and antimony were found on the sample taken from the back of Watkins’s left hand. Whitehead testified that the presence of these substances was “indicative” of gunshot residue.
 

 ¶ 22. Whitehead testified that a gunshot-residue test could have three results: positive, indicative, and negative. He testified that the particles from Watkins’s test were classified as indicative rather than
 
 *813
 
 positive because “the morphology was not textbook.” He testified that the particles are usually round, but in the samples taken, the particles were non-spherical. Therefore, he could not characterize the sample as positive for gunshot residue. Despite characterizing the particles as indicative rather than positive, Whitehead went on to testify as follows:
 

 the only thing that would have lead, barium[,] and antimony is gunshot residue. I don’t know of anything else that has been shown that would produce particles like this. But, again, because they didn’t meet the strict textbook definition of what gunshot residue is, they were called “indicative” and I issued an indicative report.
 

 ¶ 28. Watkins next argues that he rode in the back of a police car, so it is likely that gunpowder was transferred to the back of his hand in the car. There was no evidence presented that it was possible that gunpowder was transferred to Watkins’s hand while he was riding in his uncle’s patrol car. Whitehead testified that gunshot residue on a person’s hand indicates one of three scenarios: “The person discharged the weapon, they were close to a weapon at the time of discharge — by ‘close’ I mean two to three feet, or they handled something with gunshot residue on its surface.” It does not seem likely, nor was it presented to the jury, that a gun was fired in the back of Deputy Davis’s patrol car while Watkins was in the car or at any other time.
 

 ¶ 24. Considering the evidence in the light most favorable to the verdict, we find that allowing the verdict to stand will not sanction an unconscionable injustice.
 

 ¶ 25. THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION WITH THE SENTENCE TO RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO BOLIVAR COUNTY.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.