# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01944-COA

**LESLIE TERRY SINGLEY, BRENDA TAYLOR SINGLEY AND INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**  **APPELLANTS**

v.

**TRINITY HIGHWAY PRODUCTS, LLC, KEY LLC, ATWOOD FENCE COMPANY, INC., BRYSON PRODUCTS, INC., E-TECH TESTING SERVICES, INC., CENTRAL FABRICATORS, INC., AND ENERGY ABSORPTION SYSTEMS, INC.**  **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/15/2013 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | NATHAN RICHARD GLASSMAN |
| | JOHN WILLIAM NISBETT |
| | TODD BRITTON MURRAH |
| | RONNA DIANE KINSELLA |
| ATTORNEYS FOR APPELLEES: | W. THOMAS MCCRANEY III |
| | GEORGE ELLIS ABDO III |
| | ROGER C. RIDDICK |
| | MICHAEL A. HEILMAN |
| | ZACHARY MORI BONNER |
| | RUSSELL CLAY BROWN |
| | ANDY LOWRY |
| | BRADLEY SMITH KELLY |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT GRANTED IN FAVOR OF APPELLEES |
| DISPOSITION: | AFFIRMED - 05/26/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BARNES, J., FOR THE COURT:**

¶1. This case arises from a car accident involving one vehicle driven by Leslie "Terry" Singley (Singley). On the morning of February 14, 2008, Singley was traveling westbound on Interstate 20 in Clinton, Mississippi, in his Ford F-150 pickup truck. Having set his cruise control at 65 miles per hour (mph), he was approaching a bypass near the Natchez Trace Parkway. While Singley was traveling in the left lane, passing a caravan of Entergy trucks, he inexplicably lost consciousness, veered off the roadway, and collided with a REdirective Gating ENd Terminal ("REGENT-C") and a length of W-beam guardrail used to shield a bridge parapet for the Natchez Trace Parkway. As a result of the impact, a segment of the guardrail entered the vehicle's compartment and amputated Singley's right leg below the knee.

¶2. Singley and his wife, Brenda, filed suit on September 30, 2009, against all entities involved in the design, testing, manufacturing, installation, and sale of the REGENT-C terminal. The REGENT-C end terminal was designed by Bryson Products Inc. (BPI) and manufactured by Central Fabricators. Key LLC was hired by the Mississippi Department of Transportation (MDOT) as the primary contractor; Atwood Fence Company was the subcontractor hired to install the product. The design of the REGENT-C end terminal was intended to serve the dual function of "gating" and redirecting a vehicle in the case of a side-impact collision.[1] Its design was based on a similarly designed end terminal, the slotted rail

---

[1] The 350 Report, promulgated by the National Cooperative Highway Research Program (NCHRP) in 1992, provides the recommended procedures for evaluating the performance of safety features, including guardrail end terminals. It defines a terminal as "[a] device designed to treat the end of a longitudinal barrier," such as a W-beam guardrail, and it functions by "(a) decelerating a vehicle to a safe stop within a relatively short distance, (b) permitting controlled penetration of the vehicle behind the device, (c) containing and

2

terminal (SRT), manufactured by Trinity Highway Products (Trinity).[2] Although both designs incorporated slotted rail panels, standard anchor assembly, and wooden posts, the REGENT-C also used a 3/4 inch steel cable, which extended the entire length of the system. The cable was woven through the slotted rail at certain points and connected by two cable boxes mounted on the non-traffic side of the system.[3]

¶3.     E-Tech Testing Inc. and Energy Absorption Systems Inc. (EAS) were contracted to perform the NCHRP Report 350 testing for the REGENT-C end terminal.[4] The REGENT-C was subjected to Tests 3-30, 3-31, and 3-35 before obtaining approval from the Federal Highway Administration (FHWA). In a letter dated September 5, 2002, the FHWA informed EAS that the REGENT-C met the "evaluation criteria for an NCHRP Report 350 w-beam guardrail terminal at test level 3 (TL-3) and . . . may be used on the National Highway System[.]" The approval did contain one condition: noting that the truck used in one test

---

redirecting the vehicle, or (d) a combination of a, b, and c."

[2] Trinity Highway Products merged with Central Fabricators in 2007, acquiring the assets of BPI. These assets include the rights pertaining to the REGENT-C patent. Although BPI maintains a corporate existence, Central Fabricators ceased to exist following the merger. For ease of discussion, we will refer to all the Defendants as a whole, unless otherwise indicated.

[3] Another difference between the SRT and the REGENT-C is the location of the slots. The REGENT-C has three identical rail panels with slots continuing to the terminal end, where it is attached to the non-slotted steel w-beam guardrail. The SRT's slots end before the transition to the guardrail, just after Post 3.

[4] The Federal Highway Administration (FHWA) adopted Report 350 as the standard for all federal-aid construction projects involving public roadways. Test Level 3 of Report 350 sets the parameters for crash testing both the gating capacity and redirective capacity of an end-terminal device. According to NCHRP Report 350, up to seven tests are recommended to evaluate redirective/gating devices in Test Level 3 (3-30 through 3-36).

"came to a stop straddling the rail approximately 45 m[eters] downstream from the terminal," forty-five (45) meters was set as "the minimum length of rail that should be installed when the barrier is used along a high-speed roadway to shield a bridge parapet[.]"

¶4.     The Singleys amended their complaint three times, with the third amended complaint filed on March 4, 2011. The principal charge in the complaint was that the REGENT-C end terminal attached to the guardrail was defectively designed and unreasonably dangerous. The Singleys alleged that instead of deflecting his vehicle, as it should have been "designed, constructed, and installed" to do, the REGENT-C end terminal failed, causing the guardrail to penetrate the truck's passenger compartment, which resulted in Singley's injuries. They also asserted claims of strict liability, negligent and/or intentional misrepresentation, and loss of consortium.

¶5.     To support their claims, the Singleys provided expert testimony from Doug Head and Anne Stodola. Head, an engineer and accident reconstructionist, stated that the REGENT-C was defective and unreasonably dangerous because it did not comply with the performance guidelines. Head contended that had the REGENT-C also been subjected to Test 3-11, which tests longitudinal barriers, its defective condition "would have been readily apparent."[5] Head also submitted an affidavit after discovery had been concluded that additionally asserted the Trinity Defendants had "improperly altered the original, proposed design of the REGENT-C

_____

[5] According to the NCHRP 350 Report, Test 3-11 is a recommended test to evaluate the length of need for longitudinal barriers. The 350 report defines a longitudinal barrier as "[a] device whose primary functions are to prevent vehicular penetration and to safely redirect an errant vehicle away from a roadside or median hazard." Length of need is defined as "[t]hat part of a longitudinal barrier or terminal designed to contain and redirect a vehicle."

4

submitted for FHWA approval during Test 3-35 by attaching the slotted rail to the wooden post at Post 2."

¶6.    Stodola, a mechanical engineer and accident reconstructionist, opined that the REGENT-C design had a defect that caused the guardrail to shear and pierce the vehicle's compartment.  Specifically, she stated that because the "downstream" cable box was positioned next to an area where slots were located in the guardrail, this created a "flexion point" and made the REGENT-C end terminal subject to "pocketing," causing the terminal to "snag" Singley's truck instead of redirecting it.  She declined, however, to offer any opinion in her deposition regarding a feasible alternative design.  Stodola did submit a subsequent affidavit on June 25, 2013, after discovery had been completed, in which she claimed that the SRT end-terminal design was a "mechanically feasible and available alternative design to the REGENT-C system at issue."

¶7.    The Trinity Defendants[6] moved to exclude this expert testimony under *Daubert*[7] and filed motions for summary judgment.[8]  On October 15, 2013, the trial court granted the Defendants' motions for summary judgment, concluding that the expert opinions of Head and Stodola did not prove causation and were "insufficient to withstand summary judgment."

---

[6] These include Trinity, BPI, E-Tech Testing Services Inc., Central Fabricators, and EAS.

[7] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

[8] Key and Atwood each filed separate motions for summary judgment, asserting that the guardrail and end terminal were installed in accordance with the manufacturer's instructions and that they did not breach any duty owed to the plaintiffs.  Key and Atwood also joined the Trinity Defendants' motion to exclude the plaintiffs' experts and for summary judgment.

Although noting that both Head and Stodola were generally qualified as experts, the trial judge found that Head's testimony was "unreliable" and that Stodola admitted she "would have to defer to other experts when it comes to guardrail design[.]" The trial judge also approved the Defendants' motion to strike an affidavit by Head submitted after discovery had concluded, which referenced a secondary theory of liability.

¶8.     The Singleys now appeal, raising several assignments of error regarding the trial court's grant of summary judgment.[9] Upon review, we find the trial judge properly excluded certain expert testimony in this case. We further conclude that the remaining expert testimony is insufficient to establish a product-liability claim under Mississippi law. We further find no genuine issue of material fact exists as to the Singleys' remaining claims on appeal. Therefore, we affirm the trial court's grant of summary judgment.

## STANDARD OF REVIEW

¶9.     A trial court's grant or denial of a motion for summary judgment is reviewed de novo. *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013). "[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then summary judgment "shall be rendered." M.R.C.P. 56(c). The evidence must be viewed "in the light most favorable to the party against whom the motion has been made." *Karpinsky,* 109 So. 3d at 88 (¶9).

## ANALYSIS

_____

[9] Although the Singleys raise nine issues in their brief, in the interest of clarity and efficiency, these multiple claims have been combined into three issues.

6

**I.** **Whether the trial court's exclusion of Head and Stodola's expert testimony was an abuse of discretion.**

¶10.    The crux of the Singleys' argument is that Singley hit the REGENT-C end terminal at an angle and speed within the parameters of the NCHRP 350 testing; therefore, since the REGENT-C end terminal failed to redirect Singley's vehicle and caused him severe injury, the design of the end terminal was defective and was not NCHRP 350 compliant. The Singleys provided testimony by the two experts, Head and Stodola, to support their claim that the severity of the impact was within the testing parameters and that the REGENT-C's design was defective. The Defendants, on the other hand, contend that the severity of the impact to the end terminal and guardrail was of a magnitude far exceeding "the performance tolerances established by Report 350 for crash-testing end terminal devices," and the Singleys failed to provide sufficient evidence that the REGENT-C failed due to a design defect.

¶11.    We agree with the trial judge's conclusion that Head's expert testimony – that the REGENT-C end terminal should have been subjected to Test 3-11 before being deemed compliant under NCHRP 350 – should be excluded, as it is not based on any industry methodology or peer review. As this Court has opined:

> "[T]he party offering the testimony must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation." Then the trial judge must determine whether the expert testimony "rests on a reliable foundation and is relevant in a particular case." The focus of the trial judge's analysis "must be solely on principles and methodology, not on the conclusions they generate."

*Coleman v. Ford Motor Co.*, 70 So. 3d 223, 231-32 (¶26) (Miss. Ct. App. 2011) (citing *Miss.*

7

*Transp. Comm'n v. McLemore*, 863 So. 2d 31, 36-7 (¶¶11, 13) (Miss. 2003) (internal

citations omitted)). When asked what 350-level guardrail end terminal had been accepted

using Test 3-11, Head acknowledged: "I don't know of another one." Deposition testimony

revealed that Head's averment that the REGENT-C end terminal be evaluated using Test 3-

11 was based only on his subjective opinion.

> Q.     Do you know anyone at FHWA that has contemplated putting test 3-11 within the seven test matrix[10] of test level 3 devices?
>
> A.     Within the matrix, I don't know of anybody that's thought of that. I think[,] when they look at that it's labeled as length of need redirective, that they will agree with me that the strength requirements of 3-11 need to be met by that section.
>
> . . . .
>
> Q.     All right. So . . . my point is the people that come up with the test level [seven] matrix – the seven text matrix – were an array of people from DOT to academicians to Ph.D. engineers to people who design products who came up with that standard, right?
>
> A.     Right.
>
> Q.     And those folks, in their collective wisdom, did not see fit to put test 3-11 within that seven test matrix. You would agree with that, wouldn't you?
>
> A.     I agree.

The Singleys admit in their brief that it "may very well be true" that no designer or

manufacturer of end terminals test for "'length of need' according to the parameters of Test

---

[10] *See* n. 2.

3-11."[11] We find no abuse of discretion in the trial court's decision to exclude this testimony.

¶12.     Regarding the issue of the speed and angle of the impact of Singley's truck against the guardrail, we agree there are disputed issues of fact.  Eyewitnesses claimed that Singley was traveling at a speed of "over 70" mph, and Singley's own statement was that his cruise control had been set on 65 mph prior to the incident.[12]  One eyewitness, Paul Dhaliwal, who was driving one of the Entergy trucks, stated that Singley's truck impacted the guardrail at approximately a thirty-degree angle.  Dhaliwal was traveling directly behind Singley. Another witness, Carlos Ford, said that Singley's truck "veered" over in front of the Entergy truck in which he was a passenger.  The driver of that Entergy truck, Russ Walker, said in a recorded statement that when Singley "started coming over it was a bee line for that guardrail."

¶13.     Head, however, disregarded this testimony concerning the angle, testifying it was "not reasonable" and that Dhaliwal was "just flat wrong."  Instead, Head focused on the testimony of Walker and Ford that Singley "drifted" into the other lane.[13]  Head's opinion was that

---

[11] We note that Head also admitted he knew of no other guardrail end terminal that had ever been accepted using Test 3-11.

[12] The paramedic who assisted Singley after the accident stated that he thought Singley told him "that he had his cruise set at 77 [mph]," but the paramedic also acknowledged that he could not "say with certainty [Singley] said that."

[13] The term "drifting" was suggested by counsel for the Singleys during Ford's and Walker's depositions before the witnesses actually used that term.  The following is an example of this from a portion of Walker's testimony:

[Counsel for Singleys]:     Was it as if he was drifting into your lane or what was he doing?

9

Singley struck the guardrail at an approximate angle of nine degrees. He said that if the impact was steeper than five to ten degrees, it would require "the vehicle to make a turning maneuver instead of a drifting maneuver." He stated in his deposition:

> A. There's no evidence [Mr. Singley] turned. The witnesses all say he just drifted. . . . [I]f he had been further up, they're going to describe him as he turned into the barrier. . . . They didn't. They consistently say he drifted – they – into the barrier. That keeps him on a relatively straight line. If they'd said he turned into it or he had a heavy veer, then he could be up here and turn into it. But nobody has described that. They all say he just drifted.
>
> Q. Other than Paul [Dhaliwal], which you discounted?
>
> . . . .
>
> A. Paul and his 30 degrees I disagree with.

¶14. Stodola opined that the cruise control on Singley's car was likely not engaged, although Singley himself claimed that it was set at 65 mph before the accident. But she admitted that there was no physical evidence whether Singley's cruise control was off or on. Like Head, she also stated in her report that the angle of impact was between eight to ten degrees. However, the Defendants argue that Stodola "did not perform any physical testing or computerized modeling to verify whether the impact severity of the Singley accident was within or far exceeded the performance tolerances established by Report 350."

---

Russ Walker:  Oh, yeah. Oh, yeah, it was, uh, it was definitely, he was coming straight over.

During Ford's testimony, counsel for the Singleys also questioned: "Now, did the vehicle drift over those lanes from left to right . . . or had it already gotten onto a straight trajectory?" While Ford had previously used the term "veered" to describe the vehicle's trajectory, Ford replied to the question: "It was drift. It wasn't a direct line of travel. Just gradually to the right."

¶15. We cannot say that the presence of these disputed facts is fatal to the Defendants' award of summary judgment. Even if a jury gave greater weight to the experts' opinions that the impact was within the parameters of the NCHRP 350 testing, the Singleys still had to demonstrate that a genuine issue of material fact existed that the REGENT-C end terminal was defectively designed and the defective design was the cause of Mr. Singley's injury. They also had to provide evidence that a reasonable alternative design existed that would have prevented the accident in question.

¶16. The trial court barred the Singleys' claim under the Mississippi Products Liability Act (MPLA) because their experts failed to provide any testimony that a reasonable alternative design existed for the end terminal. Upon review of the evidence, we agree with the trial court's finding that the expert opinions in this case failed to meet *Daubert* standards.

¶17. Mississippi Code Annotated section 11-1-63(f)(i)-(ii) (Rev. 2014) of the MPLA states:

> In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer, designer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller[,]. . . [t]he manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and . . . . [t]he product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

As the Mississippi Supreme Court has explained:

> If an alternative design could have been practically adopted at the time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective. [Restatement (Third) of Torts:

11

Prod. Liab. § 2 (1998).]  This unique element of proof for [a] design defect claim, is premised on the notion that liability for harm caused by product designs should attach only when the harm is reasonably preventable. Restatement (Third) of Torts: Prod. Liab. § 2(f) (1998).  For this reason, demonstrating a feasible alternative design as proof of a design defect is elemental to a claimant's prima facie case.  Accordingly, once sufficient evidence has been presented to the judge so the judge can determine that reasonable people could conclude a reasonable alternative design could have been practically adopted, the issue can be entrusted to a trier of fact.  *Id*.

*Williams v. Bennett*, 921 So. 2d 1269, 1275 (¶16) (Miss. 2006).

¶18.    Head testified that other Test Level 3-accepted slotted rail end terminals existed that could have been used, such as the SRT.  Yet when asked how the SRT would have performed if impacted under the same conditions, Head testified:  "I have not done that analysis.  I don't know."

> Q.    Okay.  So as you sit here today, your testimony is that you haven't analyzed the SRT to determine if it is a reasonable design alternative.
>
> A.    I have not analyzed it to see if it would stand the same impact that the REGENT-C failed.

Head explained that his opinion that the SRT would have been a reasonable alternative design was based on the fact it was "350 certified."  Therefore, according to Head, "[t]hat on its surface makes it a reasonable device to use."  Head's opinion fails to establish that the SRT was a safer feasible alternative, as the REGENT-C design was also evaluated and 350-certified under the FHWA.

¶19.    Furthermore, Stodola declined to offer any testimony during her deposition that the SRT was a safer design, stating she was not qualified to give that opinion.

> Q.    Are you going to be offering an opinion in this case about alternative designs of guardrail treatments that you contend were safer alternative

designs to the REGENT-C?

A.     Not intentionally.

. . . .

I'm not here to say that the SRT is a better design. I'm just here – based on what we could tell, it is different. . . . So as I said, I would not intentionally say that – I'm not here to say the SRT is a better design; I'm just saying there's a design difference.

Q.     Well are you going to say that the SRT was a safer alternative design?

A.     I have not evaluated that and would not attempt to do that.

. . . .

Q.     [Y]ou're not going to offer an opinion that the SRT or any other guardrail end treatment system on the market was a safer alternative design that the REGENT-C?

A.     Correct. I would leave that to the experts.

Although Stodola later stated that there was a possibility that the SRT "may have" performed in a manner that would have prevented the incident, she noted that she had done no testing to make that determination.

¶20.    However, after the Defendants filed their motions to exclude the Singleys' expert testimony, the Singleys filed an affidavit by Stodola on June 25, 2013, in which she averred that the SRT was a "mechanically feasible and available design alternative design to the REGENT-C system at issue." She noted that the REGENT-C was modeled after the SRT design, but in the SRT design, the steel cable does not run the full length of the termination, "eliminating the need for a second cable box[.]" As this Court has noted, a nonmovant may not attempt to defeat a motion for summary judgment "with an affidavit of a witness that

13

contradicts facts asserted in that witness's prior deposition testimony, unless the affidavit explains the discrepancy." *Jamison v. Barnes*, 8 So. 3d 238, 245 (¶17) (Miss. Ct. App. 2008) (citing *Foldes v. Hancock Bank,* 554 So. 2d 319, 321 (Miss. 1989)). It is apparent that Stodola's affidavit was an attempt to respond to the Defendants' argument that neither expert had demonstrated a feasible alternative design existed that was safer than the REGENT-C. Stodola did not explain the discrepancy in her testimony, and she had earlier stated she "would not attempt" to testify that the SRT was a safer design.

¶21.    We find that the trial judge properly excluded certain expert testimony of Head and Stodola. "Summary judgment may not be defeated through expert opinions that are not based on facts but instead are based on a guess, speculation, or conjecture." *Rogers v. Barlow Eddy Jenkins P.A.*, 22 So. 3d 1219, 1225 (¶21) (Miss. Ct. App. 2009). The remaining evidence is insufficient to raise a genuine issue of material fact as to whether the REGENT-C was defectively designed; further, the Singleys have offered insufficient evidence that a defective design caused Singley's injury.

> II.    **Whether the trial court abused its discretion in excluding the Singleys' evidence regarding the existence of a bolt at Post 2 during Test 3-35.**

¶22.    In an affidavit filed on June 28, 2013, Head claimed that for Test 3-35, the Defendants had "improperly altered the original, proposed design of the REGENT-C" submitted to the FHWA, by attaching the guardrail to Post 2, using a bolt.[14]  Head opined that "[t]o a

---

[14] Head stated that Test 3-30 used the original REGENT-C design (with the slotted rail not bolted at Post 2) submitted to the FHWA and that BPI, Central Fabricators, EAS, and E-Tech Testing "notified the FHWA that they altered the design to attach the slotted rail to Post 2" for Test 3-31. He renders no claims or opinions concerning the attachment of the

14

reasonable degree of engineering certainty, by attaching the rail at this location, Defendants were able to transfer at least some portion of the forces exerted upon the terminal to Post 2, assisting the terminal system as whole along its length and re-direct the testing vehicle after impact." But Head also noted that "[a]n exact analysis of the specific amount of force transferred to the post is not possible" because the Defendants never "tested the unaltered design of the REGENT-C (without the rail attached at Post 2) for comparison purposes." Thus, he concluded that the alteration of the design "for purposes of Test 3-35 . . . . [meant] that the design of the REGENT-C installed by [the Defendants] . . . was never demonstrated to pass the minimum performance guidelines set forth in NCHRP 350 under Test 3-35."

¶23. However, as Head's affidavit was not filed until several months after the expert-witness depositions had been conducted and only four months before the trial was scheduled, the Defendants moved to strike the testimony. The trial judge granted the motion, concluding the evidence failed "to abide by the terms of the scheduling order."

¶24. The Singleys argue that the trial court's granting of the Defendants' motion to strike the evidence concerning the existence of a bolt at Post 2 was an abuse of discretion. They contend that this evidence was "not an attempt to state a liability claim," but merely rebuttal evidence and, therefore, should have been admitted. Upon review, we find the evidence was untimely and properly excluded.

¶25. In *Howell v. Holiday*, 155 So. 3d 839, 844 (¶15) (Miss. Ct. App. 2013), this Court found that an expert's supplemental report, which contained a new theory of liability and

bolt to Post 2 in Test 3-31.

15

which was submitted less than a week prior to trial, "violate[d] Rule 4.04(A) of the Uniform Rules of Circuit and County Court because Howell failed to reveal the new subject matter of [the expert's] testimony at least sixty days before trial, and no special circumstances existed to justify Howell's late designation of this opinion." Thus, Rule 4.04(A) applies not only to late designation of an expert witness, but also the "supplementation of the reports of experts who have already been designated." *Id*. at 845 (¶15). "Allowing [the expert] to testify on this matter would result in undu[e] and irreversible prejudice to Holiday." *Id*.

¶26.   Admittedly, the expert supplementation in the present case was submitted more than sixty days before the scheduled trial date, and therefore, was not a violation of Rule 4.04(A). "However, compliance with Rule 4.04 does not excuse a party's failure to adhere to a scheduling order." *Douglas v. Burley*, 134 So. 3d 692, 698 (¶15) (Miss. 2012). A trial court "has considerable discretion in matters pertaining to discovery" and "a duty to maintain control of the docket and ensure the efficient disposal of court business." *Venton v. Beckham*, 845 So. 2d 676, 684 (¶25) (Miss. 2003) (citations and internal quotations omitted). In this case, we agree with the trial court's finding that, due to the complexity of the issues in this case, allowing a new theory of liability only four months prior to the scheduled trial would be prejudicial. New expert depositions would have to be conducted, and the Defendants allowed time to find an expert witness to counter Head's new theory.

¶27.   Consequently, we find no abuse of discretion in the trial court's grant of the Defendants' motion to strike this evidence. Moreover, the Singleys acknowledge they "never claimed that the presence (or lack thereof) of a bolt attaching the REGENT-C's slotted rail

16

at post 2 had any impact or effect whatsoever on the performance of the REGENT-C during the subject accident." Thus, this evidence would not have been sufficient to create a genuine issue of material fact necessary to preclude summary judgment.

### III. Whether the trial court erred by deciding disputed issues of fact concerning the FHWA acceptance letter.

¶28. The Singleys claim that the trial court erroneously interpreted the "meaning and intent of the FHWA" in regard to the condition in the FHWA's acceptance letter that "the minimum length of rail . . . installed" should be approximately 45 meters (approximately 148 feet). We find nothing in the record to support this claim. The trial court did address the parties' various arguments regarding this issue in its order, but made no findings of fact regarding the letter's intent. The trial judge merely concluded that plaintiffs failed to "point to a specific breach of duty that caused injury."

¶29. Furthermore, the evidence shows that the guardrail and terminal were installed according to MDOT specifications – 112.5 feet of guardrail was installed, along with the REGENT-C end terminal, which was 37.5 feet, for a total installation of 150 feet. The Singleys' expert, Head, testified that the REGENT-C end terminal should not have been used in that particular "barrier situation," apparently interpreting the condition in the letter as requiring 45 meters of guardrail, without including the additional end-terminal length. As Key and Atwood noted in their appellees' brief, the enclosures with the FHWA acceptance letter, which include the test results, show that the 45 meters was measured from the start of the REGENT-C end terminal in the test. This issue is without merit.

### IV. Whether the trial court erred in failing to address the Singleys'

**remaining claims.**

¶30. Consequently, we further find the evidence is insufficient to support the Singleys' remaining claims of strict liability, negligent and/or intentional misrepresentation, and their request for punitive damages. "With the adoption of [section] 11-1-63, common law strict liability, as laid out in *State Stove Mfg. Co. v. Hodges,* 189 So. 2d 113 (Miss.1966), is no longer the authority on the necessary elements of a products liability action." *Huff v. Shopsmith Inc.*, 786 So. 2d 383, 387 (¶11) (Miss. 2001). As we have fund that there was no genuine issue of material fact as to whether the REGENT-C was defectively designed, this claim fails as a matter of law. The Singleys also claim that the Trinity Defendants made "certain representations, explicitly and/or implicitly to users, consumers, and the general public, concerning the REGENT-C," which they assert were negligent and/or intentional misrepresentations. As the Singleys have cited no relevant authority to support this claim, we decline to address this issue. *See Barrow v. May*, 107 So. 3d 1029, 1038 (¶20) (Miss. Ct. App. 2012). Lastly, as the Singleys' claims were insufficient to withstand summary judgment, any issue brought regarding punitive damages is moot and not properly before this Court.

¶31. Accordingly, we affirm the trial court's grant of summary judgment to the Defendants.

¶32. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, ROBERTS, CARLTON AND FAIR, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION. MAXWELL, J., NOT PARTICIPATING.**

18

**JAMES, J., DISSENTING:**

¶33.    I find that genuine issues of material fact are present in this case, and that summary judgment should not have been granted.  Therefore, I respectfully dissent.

¶34.    Singley offered the expert testimonies of Doug Head and Anne Stodola to support his claims.  Head testified that the REGENT-C[15]'s performance in Singley's accident did not comport with the minimum performance requirements for the two tests, the 3-35 and the 3-11 test.  Test 3-35 was performed on the REGENT- C; however, test 3-11 was not.[16]  Head contended that it should have been performed.  Head further testified that the SRT[17] was a safer alternative.  However, Head based his opinion on the fact that the SRT had already passed the guidelines of the National Cooperative Highway Research Program (NCHRP) set out in a special report known as the NCHRP 350.  Head admitted that he did not perform any testing to examine the SRT's performance.

¶35.    Singley's other expert, Stodola, opined that the design of the REGENT-C had a basic mechanical failure that likely caused the REGENT-C to perform in the way that it did during the accident.  However, Stodola refused to offer an opinion about the SRT being a safer design because she was not qualified to testify to that supposition.

---

[15] The REGENT-C guardrail end terminal, as installed at the accident site, incorporated two steel cables intended to provide strength and redirective capabilities to the end terminal in the event of a side impact.

[16] The trial court found that the case involves three main issues: (1) Test 3-11 versus 3-35; (2) the "bolt two" theory; and (3) the length caveat in the FHWA acceptance letter, which I address in this opinion.

[17] SRT is an abbreviation for slotted rail terminal, which was designed and manufactured by Trinity.

19

¶36. On October 15, 2013, the trial court granted the Defendants' motion for summary judgment. The trial court found that Head was generally qualified, but excluded his testimony because he thought it was unreliable. The trial court also found that Stodola was qualified, but her testimony was also excluded because the trial court found that her opinion "bordered design theory," an area in which she was not qualified to offer an opinion.

¶37. Singley argues that the trial court did not correctly apply the *Daubert* standard and improperly excluded both experts' opinions in regard to the subject matter. Singly contends that the trial court essentially applied the single-factor general-acceptance test. Singley also argues that the trial court ruled on a disputed fact between Head and the Trinity Defendants' expert by stating that Head's testimony is unreliable because "he is the only person in the field that holds the opinion 3-11, versus or in addition to 3-35[,] should apply to end terminals." Singley also states that the trial court failed to conduct any evaluation of Stodola's opinion using *Daubert* criteria. Finally, Singley asserts that both Head and Stodola are qualified to testify to their respective opinions.

### A.    Mississippi Rule of Evidence 702 and *Daubert*

¶38. "The admission of expert witness testimony is within the discretion of the trial judge." *Wackenhut Corp. v. Fortune,* 87 So. 3d 1083, 1091 (¶23) (Miss. Ct. App. 2012) (citing *Kidd v. McRae's Stores P'ship,* 951 So. 2d 622, 626 (¶17) (Miss. Ct. App. 2007)). "We have also stated that "[e]ven if this Court finds an erroneous admission or exclusion of evidence, we will not reverse unless the error adversely affects a substantial right of a party." *Id.*

¶39. Mississippi Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

¶40.    In *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S 579 (1993), the United States Supreme Court rejected the general-acceptance test. The Court stated that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* The Court further stated that "the trial judge must determine at the outset, pursuant to Rule 104(1), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592-93. Widespread acceptance in the field of study can also play an important role in a trial court's decision to admit expert testimony. *Id.* at 594.

¶41.    In *Mississippi Transportation Commission v. McLemore,* 863 So. 2d 31 (Miss. 2003), the Mississippi Supreme Court adopted the *Daubert* standard and rejected *Frye.*[18] The Court acknowledged that the application of *Daubert* is fact specific and "appropriately uses relevant factors to determine reliability." *Id.* at 38 (¶18). The Court stated:

The Court in *Daubert* adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. The focus of this analysis "must be solely on principles and methodology, not on the conclusions they generate." These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general

---

[18] *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).

acceptance within a relevant scientific community. The applicability of these factors depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony. The *Daubert* Court emphasized that the reliability inquiry contemplated by Rule 702 "is a flexible one."

*Id.* at 36-37 (¶13) (internal citations omitted).

### B.      Expert Testimony

¶42.    Doug Head was one of Singley's experts who testified in several depositions over the course of litigation. He testified that REGENT-C was defective and unreasonably dangerous because it did not comply with the performance guidelines for Test Level 3 end terminals. Head endorsed the 3-11 length-of-need test. The trial court found that Head was generally qualified to testify about the REGENT-C's design, NCHRP 350, and the subject accident sequence. The trial court further held that Head's opinion concerning the applicability of the 3-11 test was flawed and unreliable because he was the only person in his field who holds the opinion about the existence of a suitable alternative design.

¶43.    The second expert, Stodola, was an expert in the fields of accident reconstruction and mechanical engineering. Stodola intended to testify to specific mechanical defects or failures of the REGENT-C that Singley asserts proximately caused his injury. Stodola is a licensed engineer and trained accident reconstructionist. Stodola testified that the weakened beam placed next to a stiffened section with increased mass created a point on the REGENT-C capable of "snagging" or "hooking" a vehicle. Stodola also testifies that if the truck had been redirected, as it should have been, Singly would not have been injured in the way he was hurt in this case. Stodola also testifies that it was the combination of the slotted sections of rail next to the second cable box and the transition point between the REGENT-C and the non-

22

slotted steel guardrail that caused Singley's injuries.

¶44. The trial court agreed that Stodola is qualified as an expert witness. However, the court excluded Stodola's testimony because it stated that the testimony bordered on design theory. As a result the trial court held that Stodola was not qualified to draw the conclusions she made in her depositions. Singley argues that Stodola was merely using her education and experience as a mechanical engineer and accident reconstructionist to render an opinion in her field.

¶45. When a party offers expert testimony, he "must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation." *Delta Reg'l Med. Ctr. v. Taylor,* 112 So. 3d 11, 25 (¶42) (Miss. Ct. App. 2012) (citing *Bailey Lumber & Supply Co. v. Robinson,* 98 So. 3d 986, 994-95 (¶23) (Miss. 2012)). Further, the supreme court has stated that "an expert's testimony is presumptively admissible when relevant and reliable." *Hubbard ex rel. Hubbard v. McDonald's Corp.,* 41 So. 3d 670, 675 (¶17) (Miss. 2010) (citing *McLemore,* 863 So. 2d at 36). The supreme court has held that when an expert's opinion is attacked with credible evidence that his opinion is not accepted in the scientific community, the proponent of the expert testimony must provide a minimal defense of the opinion's reliability. *Hill v. Mills,* 26 So. 3d 322, 332-33 (¶41) (Miss. 2010).

¶46. In response to the majority opinion, Head and Stodola were properly qualified as expert witnesses by the trial court, and their testimonies were improperly excluded. The majority opinion adopts the language of the trial court in using the words "safer" or "better"

23

alternative design. The claimant must prove by a preponderance of the evidence that the product was designed in a defective manner. Miss. Code Ann. § 11-1-63(a). The statute requires Singley to show:

> The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

Miss. Code Ann. § 11-1-63(f)(ii). Head and Stodola's testimonies satisfy the statutory requirements. The testimony of Head's and Stodola showed that the automobile should have been redirected, and that the leg should not have been severed.

¶47. Head and Stodola's testimonies raise genuine issues of material fact. The testimonies directly contradict the Trinity Defendants' arguments. Singley has presented sufficient evidence to survive summary judgment. The issues of whether the SRT design was better than the REGENT-C and whether the REGENT-C was defective are questions of fact to be decided by the jury based on the testimony. The trial court erroneously excluded evidence that adversely affected the substantial rights of the parties.

C. **Evidence Concerning Factual Existence of Bolt at Post 2 During Test 3-35**

¶48. Singley contends that the trial court's order was an abuse of discretion. Singley also argues that the rebuttal or impeachment evidence offered was mistakenly referred to as bolt-two theory. Singley further argues that the delay was caused by the Defendants' failure to timely disclose the fact that BPI, EAS, and E Tech altered the originally proposed design of the REGENT-C. Singley asserts that, because of the existence of a bolt attaching the

24

REGENT-C's rail to Post 2 during the 3-35 test is impeachment evidence that is supported, he does not need to prove that the bolt caused his injuries.

¶49. "The admissibility of evidence is left to the sound discretion of the trial court within the boundaries of the Mississippi Rules of evidence, and it will not be found in error unless the trial court has abused its discretion." *Moss v. State,* 977 So. 2d 1201, 1207 (¶4) (Miss. Ct. App. 2007) (citing *Harris v. State,* 861 So. 2d 1003, 1018 (¶41) (Miss. 2003)). The appellate court will not reverse the admission or exclusion of evidence unless it "adversely affects a substantial right." *Robinson Prop. Mgmt. Grp. v. Mitchell,* 7 So. 3d 240, 243 (¶9) (Miss. 2009).

¶50. The trial court referred to Singley's "impeachment evidence" as a theory, and held that it would be unfairly prejudicial to allow Singley to allow a new theory shortly before trial. Singley submitted an affidavit from Head discussing the bolt-two issue after the *Daubert* and other dispositive motions were filed. The Court found that the information in Head's affidavit was available by his deposition date.

¶51. In the amended complaint, Singley alleged that "the REGENT-C guardrail deviated in a material way from the manufacturing specifications from otherwise identical units manufactured to the same manufacturing specifications." Singley argues that there was a flaw in the REGENT-C's design that prevented it from preforming correctly. Head's affidavit opined that the altered REGENT-C was not submitted to the 3-35 test, and has not been demonstrated to pass the minimum performance guidelines set forth in the NCHRP 350. Head's affidavit also stated how the REGENT-C being attached at Post 2 may have affected

25

its performance during the collision.

¶52.    Singley has previously alleged that a design flaw in the REGENT-C existed.  The affidavit Head submitted to the court appears to support that theory.  The Mississippi Supreme Court has held that parties have a right to their theory of the case.  *Burnwatt v. Ear, Nose & Throat Consultants of N. Miss.,* 47 So. 3d 109, 118 (¶36) (Miss. 2010).

¶53.    The majority opinion states that the trial court did not abuse its discretion in excluding Singley's impeachment evidence regarding the existence of a bolt at Post 2 during the 3-35 test.  This factual dispute was supported and did not depend on the witnesses.  The existence of a bolt attached to the REGENT-C's rail at Post 2 during Test 3-35 was supported by the tangible evidence of photographs and video recordings.  These facts were also known by Trinity, and there was no new theory and no new discovery needed.

¶54.    Whether there was a design flaw in the REGENT-C that impaired its ability to function as it should is a disputed fact.  Therefore, summary judgment is not appropriate.

### D.    Summary Judgment

¶55.    "[W]here disputed facts exist or where different interpretations or inferences can be drawn from undisputed facts, summary judgment is inappropriate."  *Morgan v. Citizens Bank,* 912 So. 2d 1133, 1135 (¶9) (Miss. Ct. App. 2005) (citing *Johnson v. City of Cleaveland,* 846 So. 2d 1031, 1036 (¶14) (Miss. 2003)).

¶56.    Singley argues that the trial court erred in viewing the evidence in the light most favorable to the Defendants on several different issues, including the intent and meaning of the facts and opinions of the Federal Highway Administration (FHWA) expressed in the

REGENT-C's acceptance letter, and Singley's claims in regard to the MPLA, causation, a feasible alternative design to the REGENT-C, strict liability, negligence, intentional misrepresentation, and punitive damages.

¶57. As previously mentioned, when reviewing the grant or denial of a summary-judgment motion, "the evidentiary matters are viewed in the light most favorable to the nonmoving party." *Matthews v. Horsehoe Casino,* 919 So. 2d 278, 280 (¶5) (Miss. Ct. App. 2005). "[I]f after examining the evidentiary matters there is a genuine issue of material fact, the grant of summary judgment is reversed." *Id.* "The opponent to summary judgment carries a burden of rebuttal, one which arises after the moving party has satisfied the burden of proof that no genuine issue of material fact exists." *Miller v. Myers,* 38 So. 3d 648, 652 (¶13) (Miss. Ct. App. 2010). The Supreme Court of Mississippi has stated that "[i]f there is doubt as to whether a fact issue exists, it should be resolved in favor of the non-moving party. That is, it is better to err on the side of denying a motion for summary judgment if a doubt exists as to whether a genuine issue of material fact exists." *McClinton v. Delta Pride Catfish Inc.,* 792 So. 2d 968, 972-73 (¶7) (Miss. 2001).

¶58. It should also be noted that in the trial court's order several disputed facts are discussed. The trial court stated that "[t]he physical factors such as angle, speed and exact point of impact are in dispute although all experts agree he impacted the REGENT-C causing part of the guardrail, not the REGENT-C[,] to enter the passenger/driver compartment of his vehicle." The order also stated:

The FHWA acceptance letter states:

Since the pickup truck came to a stop straddling the rail approximately 45 m (approximately 150 feet) from the terminal, this is the minimum length of rail that should be installed when the barrier is used along a high speed roadway to shield a bridge parapet or vertical rigid object located directly behind the guardrail.

The judge further states in his order: "The parties dispute whether or not this caveat was complied with and whether or not the length of the REGENT-C should be counted or included in the 150 feet." The trial court noted that Head contended that "150 feet of guardrail should have been installed in addition to the REGENT-C and state[d] that if it had been, all other things remaining constant, plaintiff would have hit standard 3-11 tested guardrail and not the end terminal, thus avoiding the particular injury." The court further noted that the Defendants argued that Head was not "qualified to give his opinion and then argue that the Court should look at the documents the FHWA would have relied upon in issuing the acceptance letter[,] which clearly show the REGENT-C was included within the approximate 150 feet requirement and was required based on the 3-11 test results, not 3-35."

¶59.    Also, the trial court made a determination on the merits about issues that should have been left within the discretion of a jury. The jury is the ultimate factfinder and should have been able to determine the facts and credibility of the witnesses. *Langston v. State,* 791 So. 2d 273, 280 (¶14) (Miss. Ct. App. 2001). However, in this case, the trial court judge decided the case on the merits when genuine issues of material fact existed.

¶60.    The majority opinion states that summary judgment was proper in favor of Trinity. The Singleys have established a prima facie case, and there is no reason to exclude the expert testimony of Head and Stodola after they have been qualified as experts. In addition, the

28

Singleys have promoted their claims by: (1) the feasible design alternative is not merely conceptual or theoretical in nature; (2) the feasible design alternative has been reduced to a scale drawing; (3) the feasible design alternative illustrates certain dimensions and safety characteristics; and (4) the scale drawing shows to a reasonable probability that it would have prevented the harm without impairing the utility, usefulness, practicability, or desirability of the product to users or consumers, as is required by Mississippi Code Annotated section 11-1-63(f)(ii). Singley has also provided photos of the REGENT-C that the product failed to function as expected.

¶61. Singley raises several issues, all of which are in direct conflict with the Trinity Defendants' position. Singley has provided sufficient evidence through expert testimony and other discovery to show that genuine issues of material fact do exist in this case. However, in the final judgment, the trial court did not strike the expert testimony, but it found that the experts' depositions and affidavits were insufficient to withstand summary judgment. Also, the court granted the motion to strike the bolt-two theory and also granted summary judgment.

¶62. The majority opinion addresses Singley's remaining claims that were not addressed by the trial court, and I decline to address these issues on appeal. These issues should be addressed by the trial court on remand.

¶63. I find that the trial court abused its discretion and erroneously excluded evidence that has adversely affected the substantial rights of the parties. Summary judgment is not proper because genuine issues of material fact exist, and the case should be reversed and remanded.